**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- :
RYAN O'DELL,                                              :
                                                         :
                    Plaintiff,                            :     Civil Action No. 22-cv-9779
                                                         :
v.                                                       :     **COMPLAINT FOR VIOLATIONS OF**
                                                         :     **SECTIONS 14(a) AND 20(a) OF THE**
POSHMARK, INC., MANISH CHANDRA,                           :     **SECURITIES EXCHANGE ACT OF**
NAVIN CHADDHA, EBONY BECKWITH,                            :     **1934**
JEFF EPTSTEIN, JENNY MING, HANS                           :
TUNG, AND SERENA J. WILLIAMS,                             :     **JURY TRIAL DEMANDED**
                                                         :
                    Defendants.                           :
---------------------------------------------------------- :

Ryan O'Dell ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1.      This is an action brought by Plaintiff against Poshmark, Inc. ("Poshmark or the "Company") and the members Poshmark's board of directors (the "Board" or the "Individual Defendants" and collectively with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed acquisition of Poshmark by affiliates of Naver Corp. ("Naver").

2.      Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") to be filed on November 15, 2022 with the United States Securities and Exchange Commission ("SEC") and disseminated to Company stockholders.  The Proxy

Statement recommends that Company stockholders vote in favor of a proposed transaction whereby Proton Merger Sub, Inc. ("Merger Sub"), a wholly-owned subsidiary of Proton Parent, Inc. ("Parent"), will merge with and into Poshmark with Poshmark surviving as indirect subsidiary of Parent (the "Proposed Transaction"). Pursuant to the terms of the definitive agreement and plan of merger the companies entered into on October 3, 2022 (the "Merger Agreement"), each Poshmark stockholder will receive $17.90 in cash (the "Merger Consideration") for each Poshmark share owned. Parent and Merger Sub are both affiliates of Naver.

3.      As discussed below, Defendants have asked Poshmark's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy Statement contains materially incomplete and misleading information concerning the analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its fairness opinion.

4.      It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Poshmark's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Plaintiff resides in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of Poshmark stock and has held such stocks since prior to the wrongs complained of herein.

10.     Individual Defendant Manish Chandra has served as a member of the Board since 2011 and is the Company's Founder, Chief Executive Offer, and Chairman of the Board.

11.     Individual Defendant Navin Chaddha has served as a member of the Board since 2011 and is the Lead Independent Director.

12.     Individual Defendant Ebony Beckwith has served as a member of the Board since 2021.

13.     Individual Defendant Jeff Epstein has served as a member of the Board since 2018.

14.     Individual Defendant Jenny Ming has served as a member of the Board since 2019.

15.     Individual Defendant Hans Tung has served as a member of the Board since 2016.

16.     Individual Defendant Serena J. Williams has served as a member of the Board since 2019.

17.     Defendant Poshmark is a Delaware corporation and maintains its principal offices at 203 Redwood Shores Parkway, 8th Floor, Redwood City, CA 94065.  The Company's stock trades on the NASDAQ Global Select Market under the symbol "POSH."

18.     The defendants identified in paragraphs 10-16 are collectively referred to as the "Individual Defendants" or the "Board."

19.     The defendants identified in paragraphs 10-17 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.     The Proposed Transaction**

20.     Poshmark operates as a social marketplace for new and secondhand style products in the United States, Canada, India, and Australia. The Company offers apparel, footwear, home, beauty, and pet products, as well as accessories. As of December 31, 2021, it had 7.6 million active buyers. The Company was formerly known as GoshPosh, Inc. and changed its name to Poshmark, Inc. in 2011. Poshmark was incorporated in 2011 and is headquartered in Redwood City, California.

21.     On October 3, 2022, the Company announced the Proposed Transaction:

> SEONGNAM-SI, South Korea & REDWOOD CITY, Calif.--
> (BUSINESS WIRE)-- Naver Corp. (KRX: 035420) ("Naver"),
> Korea's largest internet company, and Poshmark, Inc. (NASDAQ:
> POSH) ("Poshmark"), a leading social e-commerce marketplace
> for new and secondhand style, today announced that they have
> entered into a definitive agreement under which Naver will acquire
> all of the issued and outstanding shares of Poshmark for $17.90 in
> cash, representing an enterprise value of approximately $1.2
> billion.[1] This represents a premium of 15% to Poshmark's closing
> stock price as of October 3, 2022, a 34% premium to the 30-day

volume weighted average price, and a 48% premium to the 90-day volume weighted average price of Poshmark's shares.

**Management Commentary**

Choi Soo-Yeon, Chief Executive Officer of Naver:

"The combination will create the strongest platform for powering communities and re-fashioning commerce. Poshmark is the definitive brand for fashion in the United States that provides a social network for buying and selling apparel. Naver's leading technology in search, AI recommendation and e-commerce tools will help power the next phase of Poshmark's global growth."

"Poshmark is a natural fit for our business – our two companies share a common set of values and vision around content, community and empowerment. Bringing Naver and Poshmark together will immediately put us at the forefront of creating a new, socially responsible, and sustainable shopping experience designed around sellers of all sizes and interests – from individual and influencer sellers to professional sellers, brands and specialty boutiques – and a large, loyal, and highly engaged social community. We are excited to work closely with Manish and his talented team to create lasting value for all our stakeholders."

Manish Chandra, Founder and Chief Executive Officer of Poshmark:

"The opportunity to join forces with Naver – one of the world's leading and most innovative and successful internet companies – is a testament to the strength of our brand, operating model, and what we've built over the last decade with our talented team and amazing community. Our industry continues to evolve at a rapid pace, and we are excited to continue to lead the future of shopping by providing our community with an unparalleled experience that is simple, social, fun and sustainable."

"This is a highly compelling opportunity for our employees, who will benefit from being part of a larger, global organization with shared values and complementary strengths. This transaction also delivers significant and immediate value to our shareholders. Longer term, as part of Naver, we will benefit from their financial resources, significant technology capabilities, and leading presence across Asia to expand our platform, elevate our product and user experiences, and enter new and large markets. I look

forward to partnering with Naver as we take our company into its next phase of growth."

**Redefining Commerce and Community Around a Shared Vision**

The inherent strengths of both companies lie in their unwavering commitment to content, community and empowerment:

- **Content.** Naver is home to the largest number of bloggers in Korea and the largest number of digital creators of stories (Wattpad) and comics (Webtoons) globally. Poshmark is a leader in creating unique styles and fashion trends, including the growing K-Fashion apparel segment.
- **Community.** Naver is the largest and longest-standing online community in Korea, where more than 36 million monthly users access its search portal and various online community services. Its metaverse platform, Zepeto, is the second largest metaverse app in the world, with a growing, vibrant community for members to create and share whatever they imagine. Naver's community also extends to other large, fast-growing, and highly engaged groups, including its K-Pop fandom community Weverse, which is jointly owned with BTS' management company, one of the most successful groups of all time. Poshmark is the destination of choice for more than 80 million registered users. Among them, active users spend approximately 25 minutes of their day buying and selling apparel online, and gather in-person at Posh Party Live events held in various cities around the world.
- **Empowerment.** Naver is dedicated to empowering the long tail – it is the largest enabler of e-commerce for small and medium-sized businesses in Korea and has revolutionized content creation by democratizing the publication of digital comics through Naver Webtoons. At Poshmark, anyone can easily list and sell what is hanging in their closet at home, and anyone can make a social impact through the promotion of socially responsible, sustainable commerce.

The transaction will create a global player in online fashion re-commerce by combining Poshmark's unique discovery-based social shopping platform and deeply engaged community with Naver's technological prowess in upleveling the e-commerce experience. Poshmark will also leverage Naver's proven expertise and track record in Asia and its significant expertise from backing and investing in other fashion and consumer-to-consumer (C2C) e-commerce platforms globally.

The combination accelerates Naver's strategy to build a global e-commerce community portfolio to capture the growth in large markets around the world, including Poshmark's home market of North America. Together, the companies expect to increase purchase conversion rates, deepen user engagement, create an industry leader in livestreaming commerce, and enhance the unique relationship- and discovery-based experiences that are driving fast-growing re-commerce verticals.

**Strategic and Financial Benefits**

- **Expands Long-Term Opportunity in Fashion Re-commerce and Creates Globally Distributed User Base with Influx of Younger Users:** The addition of Poshmark will expand and diversify Naver's search-driven e-commerce business into the global secondhand C2C market for fashion. The combination will also allow Naver to capitalize on the increasing consumer shift in fashion to online re-commerce, which is an $80 billion market today in the U.S. alone, and is expected to grow by 20% annually to $130 billion by 2025.[2] Poshmark currently has a community of over 80 million registered users, across 90% of zip codes in the U.S. In 2021, the company generated approximately $2 billion in gross merchandise value (GMV) with a take rate of 20% and gross margin of 85%. Its primary demographic of millennials and Generation Z users is the largest shopping demographic for secondhand goods and a key driver of the circular economy and community-based platforms. One of Poshmark's strong appeals to the growing number of conscious consumption shoppers is the important role it plays in extending the lifecycle of millions of previously made items and reducing fashion's footprint. These users will expand and complement Naver's current user base.

- **Creates a Global Commerce Community with Access to Poshmark's Social Networking and Discovery-Based Shopping:** Naver is a proven community builder, connecting more than 28 million monthly users across its Naver Café platform – an open social community where users create their own groups to share content, ideas, and information broadly, across a large number of topics and categories – as well as its Metaverse and K-Pop fandom communities. Poshmark has created unique relationship-oriented "micro" communities that are based around social engagement with friends and family and discovery-based shopping. Poshmark's simple, easy, and community-centered fashion marketplace will give Naver access to a highly engaged and diversified community, where sellers become buyers and

buyers become sellers, and add a global social networking element to Naver's portfolio of services.

- **Enhances Poshmark's User Experience with Naver's Unrivaled and Innovative Technology Offerings:** Poshmark will instantly benefit from Naver's deep technology stack and AI-based capabilities, including its smart lens image recognition and search technologies. These capabilities are highly complementary to Poshmark's product development strategy, and together will allow Poshmark to offer a new search and shopping experience by integrating Naver's shopping search engine, which allows users to enter additional search keywords according to their preference on colors, designs, and materials. Specifically, with access to Naver's image recognition technology, Poshmark users will be able to identify where to find and buy products by scanning objects and shopping through the camera on their phones without needing to know the exact name of the product. This capability will make it easier to both identify new products and sell items, enhancing the user experience.

- **Leverages Naver's Proven Data Analytics Technology to Improve Marketing and Engagement Strategies to Make Poshmark the Platform of Choice for Buyers and Sellers:** As the largest advertising platform in Korea, Naver's ad-serving infrastructure will play an instrumental role as Poshmark explores rolling out ads to its deeply engaged community. For instance, Poshmark will be able to leverage Naver's "Biz Advisor" and "Analytics" AI analytical tools, which analyze sales statistics to manage data more effectively, and in turn, increase the number of sellers on Poshmark's platform. These enhancements will dramatically advance Poshmark's service offering, resulting in greater customer acquisition, retention, and buyer conversion, as well as enhance its community engagement and user experiences. With Naver Pay commanding the largest share of online payment processing in Korea, the combination will also enable Poshmark to develop innovative payment solutions to expand its ecosystem of buyers and sellers. Additionally, with Naver's technologies, Poshmark will be able to provide more suitable product recommendations for customers after analyzing products, user communities, and the closets of the users' favorite sellers in real-time. Together, the companies can develop a service that allows users to search with shopping keywords so that the most suitable product will be recommended to the right user.

- **Enables Global Live Commerce Adoption:** Livestream shopping is a key driver of e-commerce in China and Korea (and increasingly in the U.S.) today, allowing shoppers to buy products in real-time through live video broadcasts, enabling greater insights and more clarity around purchasing decisions. Naver's

Shopping Live solution is the leader in Korea, one of the world's largest live shopping markets, and an essential feature of Naver's e-commerce platform with over $25 billion in GMV transacted in 2021. Naver expects that the enablement and enhancement of live streaming capabilities within the Poshmark platform will transform the shopping and selling experience and strengthen Poshmark's community by allowing for greater social networking and engagement.

- **Further Expands Global Footprint for Both Naver and Poshmark:** Poshmark will benefit from Naver's global presence in high-growth markets, particularly in Korea, one of the world's most innovative and highest penetrated e-commerce industries. This is where Naver is the leading search engine and largest e-commerce channel, and the only search technology company in the world that has successfully expanded into an e-commerce platform. Naver's footprint also includes Japan, where it has joint ownership in Z Holdings, one of the world's largest internet service groups, with assets such as Yahoo! Japan and Japan's leading smartphone messaging platform, LINE, which Naver created and launched in 2011 and now operates in over 230 countries and is used by more than 70% of those populations. With Naver's support, Poshmark will pursue a broader international expansion strategy in the medium-term, including into other developed markets                                              in                                         Asia.
In addition, this transaction provides Naver with an enhanced foothold in the U.S., expanding its international profile, which it has steadily increased both organically and through investments over the past 20 years. Naver will build on its existing U.S. footprint, including Webtoon Entertainment, which is based in Los Angeles and extremely popular with younger audiences, and its $600 million acquisition of Wattpad in 2021. Naver has benefited from the recent global digital disruption and transformation of media and publishing through Wattpad and Webtoon Entertainment, and looks to extend their growth in the region with the addition of Poshmark.

- **Significant Synergy Potential:** The transaction is expected to generate significant revenue and cost synergies, consisting primarily of:

o Re-acceleration of annual revenue growth beyond 20% in the near-term by leveraging Naver's advertising capabilities to drive further monetization, accelerating investment to drive growth overseas, and expanding live commerce adoption.

o Approximately $30 million in run-rate annual cost savings within 24 months post-closing including through rationalization of public company costs and driving of higher operating leverage across operating and other cost functions.

**Operating Structure and Leadership**

Upon completion of the transaction, Poshmark will become a standalone U.S. subsidiary of Naver and will continue to be led by CEO Manish Chandra and Poshmark's current management team.

Poshmark will continue to operate under its existing brand, as well as maintain its employee base, Poshmark community, and headquarters in Redwood City, California.

**Transaction Details**

The transaction, which was unanimously approved by both Naver's and Poshmark's Boards of Directors, is expected to close by the first quarter of 2023, subject to approval by Poshmark stockholders and the satisfaction of certain other customary closing conditions. The transaction is not contingent on any financing.

Naver has secured voting and support agreements with certain stockholders of Poshmark, representing approximately 77% of the outstanding voting power of Poshmark common shares.

The transaction is expected to be funded with Naver's cash balances and other existing financing sources.

\* \* \*

**Advisors**

LionTree LLC is serving as Naver's exclusive financial advisor and Kirkland & Ellis LLP is serving as Naver's legal counsel. Goldman Sachs & Co. LLC is serving as exclusive financial advisor to Poshmark, and Goodwin Procter LLP is serving as Poshmark's legal counsel.

\* \* \*

22.     The Board has unanimously agreed to the Proposed Transaction.  It is therefore imperative that Poshmark's stockholders are provided with the material information that has been omitted from the Proxy Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B.**     **The Materially Incomplete and Misleading Proxy Statement**

23.     On November 15, 2022, Poshmark filed the Proxy Statement with the SEC in connection with the Proposed Transaction.  The Proxy Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction.   The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Financial Projections*

24.     The Proxy Statement fails to provide material information concerning financial projections by Poshmark management and relied upon by Goldman Sachs in its analysis. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading. The Proxy Statement indicates that in connection with the rendering of its fairness opinion, that the Company prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and Goldman Sachs with forming a view about the stand-alone valuation of the Company. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that Poshmark management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

25.     For the Company Projections, the Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Gross Merchandise Value, Adjusted EBITDA, and Unlevered Free Cash Flow but fails to provide line items used to calculate the metrics and a reconciliation of the non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

26.     When a company discloses non-GAAP financial measures in a Proxy Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

27.     The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

---

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

28.     Thus, to cure the Proxy Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Proxy Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures to make the non-GAAP metrics included in the Proxy Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Financial Analyses*

29.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses*, the Proxy Statement fails to disclose: (i) the implied future enterprise values of Poshmark as of December 31 for each of the fiscal years 2023, 2024, and 2025; (ii) the inputs and assumptions underlying the range of enterprise values to NTM revenue multiples of 1.5x to 3.0x; (iii) the inputs and assumptions underlying the EV/NTM gross profit multiples of 1.75x to 3.50x; (iv) the Company's projected debt and projected cash as of December 31, 2023, 2024, and 2025; (v) the projected number of fully diluted outstanding shares of Poshmark common stock as of December 31, 2023, 2024, and 2025; and (vi) the inputs and assumption underlying the illustrative discount rate of 15.0%.

30.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the range of illustrative terminal values for Poshmark; (ii) the inputs and assumptions underlying the range of perpetuity growth rates of 2.0% to 4.0%; (iii) the inputs and assumptions underlying the use of the range of discount rates of 12.5% to 15.0%; (iv) the Company's weighted average cost of capital; and (v) the number of fully diluted outstanding shares of Poshmark common stock as of September 30, 2022.

31.     With respect to Goldman Sachs' *Premia Analysis*, the Proxy Statement fails to disclose the transactions reviewed and the premia for those transactions.

32.     In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100**

33.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

34.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

35.     Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

36.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

37.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives.

38.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

39.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.     The Individual Defendants acted as controlling persons of Poshmark within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Poshmark, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Poshmark, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

41.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

42.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Poshmark, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual Defendants were thus directly involved in the making of the Proxy Statement.

43.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

44.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

45.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

46.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the Defendants jointly and severally, as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.     Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 16, 2022                    **MELWANI & CHAN LLP**

                                        By:   */s/ Gloria Kui Melwani*
                                              Gloria Kui Melwani (GM5661)
                                              1180 Avenue of the Americas, 8th Fl.
                                              New York, NY 10036
                                              Telephone: (212) 382-4620
                                              Email: gloria@melwanichan.com

                                              *Attorneys for Plaintiff*